UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                          :    Chapter 11

STINGFREE TECHNOLOGIES, INC.                   :

          Debtor                               :    Bankruptcy No. 08-16232bf

................................................

MEMORANDUM

................................................

Robert A. Vito and Lisa Vito (plus two companies owned by them, VI

Capital Company and Americ Investments Company) have filed a joint motion to dismiss

this chapter 11 case pursuant to 11 U.S.C. § 1112(b), or, in the alternative, to obtain relief

from the automatic stay.[1]  The Vitos contend that the instant chapter 11 case was filed in

bad faith, "to obtain a tactical litigation advantage" and with "no valid reorganization

purpose[.]"  Vitos' Memorandum, at 3.

The debtor asserts that no relief under section 1112(b) is warranted.

Furthermore, the debtor has filed its own motion to approve bidding procedures for the

sale of certain patent rights to take place in the context of this chapter 11 case, but prior to

confirmation.  The Vitos oppose the debtor's motion, arguing, inter alia, that the debtor

does not own the intellectual property rights it seeks to sell, and that the debtor has

included bidding procedures intended to chill an open bidding process thereby favoring as

purchaser an entity that includes certain shareholders of the debtor: Fonika Ventures,

LLC.

---

[1]I shall refer to the joint movants as the Vitos.  As will be discussed, there was an
extensive evidentiary hearing held on this motion, at the conclusion of which the Vitos stated that
they sought conversion of this case to chapter 7.  In their posthearing memorandum, they seem
again to prefer dismissal over conversion.  Vitos' Memorandum, at 3.

An evidentiary hearing took place over two days, producing a consolidated evidentiary record involving these two motions.[2]  Based upon that record, I make the following factual findings.

## I.

In the mid-1980s Dr. Thomas Fallone approached Dr. Carmen DiMario about the former's idea to develop a product to absorb shock vibrations when using golf clubs.  12/18/08 at 9:31-:32.[3]  These two men ultimately formed Pendulum Corp. and patented multi-layer technology designed to reduce or absorb such undesirable vibrations. 12/18/08 at 9:32-:33.  Over time, however, they became dissatisfied with their ability to market their patents under the direction of Pendulum's chief executive officer.  12/18/08 at 9:33.

In June 2001, they formed a new Pennsylvania corporation called Inner Core,[4] changed the corporation's name in 2003 to Stingfree, 12/18/08 at 10:03, and renamed the corporation again in 2005 to Stingfree Technologies.  12/18/08 at 9:33, 9:56, 10:03.  Inner Core purchased the patent rights held by Pendulum.  12/18/08 at 9:57-:59.

---

[2]Given the agreed upon hearing dates, the extensive and consolidated nature of the hearing, and the posthearing briefing schedule agreed to by the parties, the time constraints for adjudication found in section 1112(b)(3) are inapplicable.  See In re Kent, 2008 WL 5047799, at *1 n.2 (Bankr. D. Ariz. 2008); In re First Assured Warranty Corp., 383 B.R. 502, 512 (Bankr. D. Colo. 2008); see also In re SeSide Co., Ltd.,155 B.R. 112, 116-17 (E.D. Pa.,1993).

[3]Citations to the audio record of the hearing that took place December 17, 2008 and December 18, 2008 will be as follows "date at hour:minute."

[4]Or possibly Inner Core Grip, Inc.

Mr. Robert A. Vito became the president, chief executive officer and chairman of the Board of Directors of this new corporation.  12/18/08 at 10:03-:04.  He testified that he invested $150,000 in 2001.  Id.  The initial shareholders of the corporation ultimately known as Stingfree were Messrs. Fallone, DiMario and Vito.  12/18/08 at 9:59-10:00.  Messrs. Vito and Fallone, and Mr. Joshua Smith, were the corporate directors by 2003, with Dr. DiMario engaged as a corporate consultant involved with technology development.  12/18/08 at 9:45.  In June 2006, Stingfree entered into an employment agreement with Mr. Vito, which agreement referred to him as the "key" executive and which mentions certain personal loans made by Mr. Vito to Stingfree.  Ex. D-2.

After its incorporation, Stingfree raised additional capital from other shareholders, developed further patents involving three-layer shock dissipation for various products, and began licensing its technology to other companies.  12/17/08 at 10:16, 10:23; 12/18/08 at 10:00.  It also began to manufacture some of its own products, such as golf club grips and insoles.  12/17/08 at 10:24; 12/18/08 at 10:14.  Among Stingfree's licensees was Lamkin Corporation, a large manufacturer of golf club grips.  12/17/08 at 10:23; 12/18/08 at 10:14.  Stingfree operated out of a basement office of the home of Robert and Lisa Vito (as did another corporation run by Mr. Vito known as Unbreakable, Inc.), for which Stingfree was charged rent.  12/17/08 at 9:51; 12/18/08 at 10:59-11:00, 11:09-:10.

In December 2007, Stingfree engaged the services of an accountant, Mr. Christopher Nawn, CPA, to review its books and records.  He prepared a report of his findings in January 2008 based upon a review of limited corporate records.  Ex. D-14.

3

On January 5, 2008, Stingfree, through Drs. Fallone and DiMario, sought to replace Mr. Vito with Mr. Richard Rudinger as it chief executive officer and board chairman. Exs. D-1; D-2; VI-19. (Mr. Vito would retain the title of corporate president, but would have no role in marketing or in operating the company. 12/17/08 at 10:07.) Mr Rudinger had some prior experience in marketing intellectual property and was familiar with Stingfree's patents, as he had been an informal consultant to the company previously. 12/17/08 at 9:46-:47. Mr. Vito opposed his ouster by the Board of Directors and sought to replace those corporate directors through a special shareholders' meeting.

Thereafter, litigation involving Stingfree, Dr. Fallone, Mr. Rudinger and Mr. Vito ensued in state and federal court. In that litigation, both Messrs. Vito and Rudinger purported to act on behalf of Stingfree.

In February 2008, negotiations commenced to resolve these competing claims. The Vitos retained counsel that had represented the corporation in a number of matters. Drs. Fallone and DiMario retained their own counsel, one of whom was the son of Dr. DiMario.[5] These negotiations ultimately resulted in a document titled "Stock Redemption, Separation and Settlement Agreement" dated February 29, 2008. Exs. D-3; VI-27. As the terms of that agreement are important in resolving these motions, I shall summarize and/or quote its most relevant provisions.

This agreement provided for the Vitos to sell 68,219,000 shares of Stingfree stock titled in their names (and to transfer 6,460,000 options to purchase stock) to

---

[5]On March 6, 2008, Mr. Rudinger wrote an email message, with copies to shareholders, that "numerous shareholders, two lawyers, several CPA's and our entire team at Stingfree" were involved in the negotiations that produced the settlement with the Vitos. Ex. VI-18.

Stingfree for $3,900,000, plus the assumption by Stingfree of certain corporate debts payable, or otherwise guaranteed, by the Vitos. Id.[6]  The Vitos received a promissory note in this amount, with payments to be made at three stated intervals over roughly a 25 month period from February 29th.  The first payment of $1 million was due by May 19, 2008.   The promissory note contained a confession of judgment provision.

The settlement agreement also provided that Mr. Vito would resign immediately as Stingfree president; a June 2006 employment agreement between Stingfree and Mr. Vito was terminated immediately; and Mr. Vito agreed not to compete with Stingfree for 12 months and to keep confidential corporate information. Furthermore, the two pending lawsuits involving Stingfree and the Vitos were to be withdrawn.  A mutual release attached to the settlement agreement was signed that included all claims "in law or equity which the Releasors ever had, [or] now have. . . ." Id., ex. F, ¶ I(A), (C).

The settlement agreement also recited that Stingfree was the sole owner of its patents.  However, as security for promised payments from the corporation, the Vitos received a pledge of the stock being sold to the corporation as well as a "first lien security interest in the Patents held by the Company on the date hereof," id., ¶ I(D)(2), along with an assignment of patent rights.  Id., ¶ IV(C)(3)(d), (4)(a).

The Vitos also promised:

Within thirty days (30) [sic], the Sellers shall use his [sic] best efforts to deliver all property of the Company Seller believes he has possession of to representatives of the Company. Included, without limitation, in the turnover, are all the

---

[6]This agreement recited that Stingfree had issued a total of 129,637,000 shares of stock.  Thus, the recital indicates that the Vitos were the majority shareholders of the corporation.

corporate records of the Company and all Affiliates, weather [sic] in electronic and/or hard copy form, reflecting the Company's corporate existence, the existence of all Affiliates, the patents, trademarks, service marks and other intellectual property rights, corporate accounting records, corporate bank account statements, corporate correspondence, including correspondence with investors, all federal, state and or local tax returns, including payroll tax returns, filed by the Company or an Affiliate, product samples, products, product materials, advertisements, infomercial "masters" (if owned), dvds, cds, vhs tapes, office supplies, computers, electronics, furniture, or any other tangible property.

Id., ¶ IV(B).

The agreement contained the following representations made by the Vitos and by Stingfree:

## V. REPRESENTATIONS OF THE SELLERS

As of the date of this Agreement, Sellers represent, intending for the Company to rely hereon, as follows that absent a default by the Company hereunder:

A. Sellers have caused Robert Vito and all Affiliates to file all required federal, state, and local tax returns from inception through the date hereof and paid such amounts reported to be due on such returns, except as set forth on Exhibit "G".

B. The only entities formed by Robert Vito on behalf of the Company are Sting Free Body Company, LLC, Sting Free Gear Company, LLC, StingFree Grip Company, LLC, StingFree Shoe Company, StingFree Shoe Company, LLC, and StingFree Tape Company, LLC and Sellers agree to give up any and all rights, if any and relinquish full control if any, to the Company of such entities and any other entities formed using the "StingFree" name[.]

C. Except as provided in paragraph II.D and as contemplated in the Security Agreement above, Seller agrees to give up any and all rights and relinquish full control to Company of all patents, active, pending or in development, trademarks, copyrights, web domains (including but not limited to stingfree.com, stingproof.com, sting-free.com, sting-proof.com, and all other associated or related domains),

6

intellectual property and any other intangible property which are related to or owned by Company, Sting Free Body Company, LLC, Sting Free Gear Company, LLC, StingFree Grip Company, LLC, StingFree Shoe Company, StingFree Shoe Company, LLC, and StingFree Tape Company, LLC, and any other entities formed using the "StingFree" name.

D. Except as provided in paragraph II.D, and as contemplated in the Patent Security Agreement, Sellers agree to give up all rights to any and all StingFree patents as of Closing[.]  Robert Vito agrees to execute any and all further agreements and documentation to relinquish these patent rights, and give full control of said rights to the Company.

## VI. REPRESENTATIONS OF THE COMPANY

The Board of Directors and Officers of the Company, who shall be party to this Agreement for such purpose, and the Company hereby represent and warrant to the Sellers, intending for the Sellers to rely thereon as follows:

A. The Company is a corporation duly organized, validly existing under the laws of the Commonwealth of Pennsylvania.

B. Authorization

1. The execution and delivery of this Agreement, the Note, the Stock Pledge Agreement, the Patent Security Agreement, the Mutual Release, and any other documents related to the transaction contemplated herein (the "Transaction Agreements"), the purchase of Seller's Stock and any other actions contemplated hereby, have been duly authorized by all requisite corporate action on the part of the Company.

2. The Company has the corporate power and authority to consummate the transactions on its part contemplated hereby; none of which will constitute any violation or breach of its Articles of Incorporation or Bylaws.

3. The Transaction Agreements constitute the legal, valid and binding obligations of the Company, enforceable in accordance with their respective terms.

C. Patents.

7

1. The Company has the right to assign the Patents under the terms of the Security Agreement.

2. Until such time as the Company has satisfied all of its obligations to Seller under the Transaction Agreements, the Company shall maintain [the] Patents in full force and effect, as per the Patent Security Agreement.

D. Private Placement Memorandums.  The Sellers shall not be identified or referenced in any Private Placement Memorandum ("PPM").

Id.

In addition to these representations, the parties included a dispute resolution provision that included mediation and binding arbitration, as well as a provision governing defaults:

VII. DISPUTE RESOLUTION

In the event [of] any dispute or controversy arising out of or relating to this Agreement, the Transaction Agreements or any other ancillary documents related to the transaction, the Parties agree to exercise their best efforts to resolve the dispute as soon as possible.  The Parties shall, without delay, continue to perform their respective obligations under this Agreement which are not affected by the dispute.

A. Mediation. . . .

B. Arbitration. Any controversies or disputes arising out of or relating to this Agreement shall be resolved by binding arbitration in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association. The parties shall endeavor to select a mutually acceptable arbitrator knowledgeable about issues relating to the subject matter of this Agreement.  In the event the parties are unable to agree to such a selection, each party will select an arbitrator and the arbitrators in turn shall select a third arbitrator.  The arbitration shall take place at a location that is reasonably centrally located between the parties, or otherwise mutually agreed upon by the parties.  All documents, materials and information in the possession of each party that are in any way relevant to the claim(s) or dispute(s) shall be made

8

available to the other party for review and copying no later
than 5 days after the notice of arbitration is served.  The
arbitrator(s) shall not have the authority, power, or right to
alter, change, amend, modify, add, or subtract from any
provision of this Agreement or to award punitive damages.
The arbitrator shall have the power to issue mandatory orders
and restraining orders in connection with the arbitration.  The
award rendered by the arbitrator shall be final and binding on
the parties, and judgment may be entered thereon in any court
having jurisdiction.  The agreement to arbitration shall be
specifically enforceable under prevailing arbitration law.
During the continuance of any arbitration proceeding, the
parties shall continue to perform their respective obligations
under this Agreement.

VIII. DEFAULT

A. A default under the terms of any of the Transaction
Agreements shall be considered a default under all such
agreements.  All defaults, except monetary defaults, are
curable, and if not so cured shall be resolved according to the
Dispute Resolution Section herein.

B. All representations provided herein by either party shall
survive the closing of the transactions contemplated herein,
and any misrepresentation made by either party shall be
considered a default by such party.

Id.

At the hearing on these contested matters, Mr. Rudinger, who had been

involved in the settlement negotiations on behalf of Stingfree, explained that Stingfree

agreed in February 2008 to pay approximately 5¢ per share to the Vitos, in the belief that

it could resell those shares to future investors for 25¢ per share.[7]  12/17/08 at 2:20-:22.

_____

[7]In a March 6, 2008 email message, Mr. Rudinger wrote to a Stingfree
shareholder, Paul Keating, who was questioning the settlement agreement:

In essence Paul the company settled with Mr. Vito to purchase all
75,000,000 shares [this figure probably includes warrants and
options in this total] for $3.9 million or $0.052 cents per share over

(continued...)

Shortly after this settlement agreement was signed, Messrs. Rudinger and

Smith, on behalf of Stingfree, announced to its shareholders that a settlement with Mr.

Vito had been reached, and that the debtor intended to issue a new private placement

memorandum for additional capital investment. Ex. VI-17. Before any new investment

was solicited, disputes developed between Stingfree and Mr. Vito. Mr. Vito delivered

certain boxes of records and materials, ex. VI-42, that Mr. Rudinger considered deficient.

See exs. D-16, D-18, D-19; 12/17/08 at 10:48-:49. Moreover, digital copies of corporate

financial records delivered on March 14, 2008, prepared by the Quickbooks software

program, had been altered since their original entries. See exs. D-13, VI-40; 12/17/08 at

10:07. Mr. Rudinger was suspicious of these alterations. 12/17/08 at 10:07, 10:37-:38.

Furthermore, with Rudinger's support, Stingfree refrained from seeking further investors

via a private placement memorandum it had commissioned, ex. VI-16, because it

considered the corporation's financial records unauditable, 12/17/08 at 10:36, 10:58, and

because recent tax returns had not been filed for the debtor.[8] Id., at 10:36-:37.

On March 28, 2008, Stingfree sent to the Vitos a notice of default under the

terms of the settlement agreement. Ex. D-4. The Vitos responded that they had cured any

alleged defaults, ex. D-5 (which Stingfree rejected, ex. D-6), and sent their own notices to

---

[7](...continued)
2 years. We all believe securing 75,000,000 shares for that price
was a win/win to return those shares to our treasury. Our current
PPM is priced at $0.25 cents.

Ex. VI-18.

[8]Whether federal or state securities law required audited financial statements
under the intended private placement memorandum is an issue I need not determine.

the debtor when they did not receive their $1 million payment by the extended deadline of

May 31, 2008.  See exs. VI-28, VI-29.

Thereafter, the Vitos confessed judgment against Stingfree in Pennsylvania

state court in the amount of $4.11 million, ex. D-9, and recorded that judgment in

California, ex. D-15, and possibly Maryland.  Moreover, as part of the settlement

agreement, the Vitos recorded the patent assignment obtained with the United States

Patent Office on July 9, 2008.  Exs. VI-30, VI-31.  Thereafter, the Vitos have been

attempting to market and license those patents.

Throughout the Vitos' post-settlement disputes with Stingfree, the Vitos

have been represented by former corporate counsel.  In addition, while Mr. Vito opined

that the Stingfree patents were worth more than $3.9 million,[9] and that those patents now

belong to the Vitos, the Vitos still assert that they are owed more than $4 million by the

debtor.  See ex. D-15 (California writ of execution filed on September 23, 2008, asserting

a judgment claim of more than $4.16 million); proof of claim #3.

Stingfree filed a petition to strike the Vitos' confessed judgment in

Pennsylvania state court.  It also sought, unsuccessfully, in state court to enjoin the Vitos

from using the patents, pending the outcome of its petition to strike the confessed

judgment.  As part of its petition, Stingfree asserted that the Vitos' claims against them

were subject to arbitration.

Stingfree filed the instant chapter 11 bankruptcy case on September 25,

2008, just prior to a hearing on Stingfree's state court petition to strike the confessed

judgment.  Ex. VI-36.  At the time of its bankruptcy filing the debtor was conducting no

_____

[9]And thus, as will be discussed below, should not be sold to Fonika for $300,000.

11

business and had but two part-time employees, neither being paid: Mr. Rudinger, the
chief executive officer, who was involved in some business ventures of his own; and Dr.
DiMario, who has his own medical practice.  12/17/08 at 2:10.  The debtor had two
directors at that time—Dr. Fallone and Mr. Smith—but Mr. Smith has since resigned.
12/18/08 at 9:11.  In its post-bankruptcy "Small Business Statement of Operations," the
debtor states that it has received no income nor made any disbursements since its
bankruptcy filing.

          Stingfree's bankruptcy schedules disclose no real property, and the debtor
leases no business location.  The debtor's address listed on its bankruptcy petition is the
home of Dr. DiMario.[10]  For its assets at the time of its bankruptcy filing, Stingfree
scheduled one outstanding receivable in the amount of $60,000 allegedly owed by
Lamkin Corporation, a bank deposit of $4,810, unknown value for its present licensing
agreements with Lamkin Corporation, unknown value for its alleged claims against the
Vitos (to be discussed below) and a valuation of $300,000 for its patents, trademarks and
other intellectual property rights.  See ex. VI-4.  The intellectual property claimed as part
of the bankruptcy estate includes those patents identified in the February 2008 agreement
with the Vitos, and which the Vitos now claim as owned by them in light of the debtor's
default in payment and their assignment notification to the Patent Office in July 2008.

          In August 2008, Mr. Rudinger decided to attempt to sell the patent rights
and communicated with individuals he considered potential purchasers.  12/17/08 at
11:22-:23.  He eventually was referred to an attorney to determine whether any of that

---

          [10]Compare proof of claim #35 filed by the debtor on behalf of Dr. DiMario, which
includes Dr. DiMario's address, with the debtor's address on its bankruptcy petition.

attorney's clients might be interested. 12/17/08 at 11:25. The attorney then formed

Fonika as a vehicle to purchase Stingfree's intellectual property, and negotiated a

purchase price of $300,000. Among Fonika's members are Drs. DiMario and Fallone,

plus a few other shareholders of Stingfree. 12/17/08 at 11:26-:27. The majority

membership interests in Fonika are not owned by the debtor's shareholders. 12/17/08 at

11:27; 12/18/08 at 9:14.

      The debtor's patent valuation of $300,000 is based upon this prepetition

sales agreement, reached on September 23, 2008, with Fonika Ventures, LLC, exs. D-10,

VI-13; 12/17/08 at 12:32, and is not based on an appraisal of the patent rights. The

Fonika sales agreement expressly contemplates that Stingfree will file a bankruptcy

petition and obtain bankruptcy court approval to sell the patent rights free and clear of all

claims, interests and liens. Exs. D-10, VI-13 at 1.

      If Fonika is successful in its purchase of the patents, it has offered

employment to Mr. Rudinger and Dr. DiMario. Exs. D-10, VI-13, at Schedule 5.6;

12/17/08 at 11:27, 2:04; 12/18/08 at 9:17. Neither individual has yet accepted this offer.

Id. Dr. DiMario supports the proposed sale to Fonika, as he believes that this entity will

further develop and license the patents. Upon the sale of the patents, Stingfree does not

intend to operate. 12/17/08 at 2:03-:04. Rather, it would use the sale proceeds to fund

litigation against the Vitos. Id.

      In filing bankruptcy, Stingfree did not have sufficient funds to engage

counsel. Fonika paid it $35,000, as a downpayment of the purchase price, which funds

were then used to retain bankruptcy counsel and pay the requisite bankruptcy filing fees.

12/17/08 at 2:13; 12/18/08 at 9:04. Fonika is only interested in purchasing the patent

rights free and clear of all claims, liens and interests, including those of the Vitos. Thus, it insists on a sale approved by this court under section 363(f).

The debtor's bankruptcy schedules list nine creditors. Those creditors include Mr. Rudinger and Dr. DiMario, who assert unpaid wage claims, as well as Mr. Vito, whose claim is listed as contingent, disputed and unliquidated in an unknown amount. Exs. VI-4, VI-6. One of these nine creditors is an attorney involved in negotiating the February 2008 settlement agreement. Mr. Vito asserts that this attorney represented the interests of Dr. Fallone, and was engaged by him rather than by the debtor. Mr. Vito also maintains that the claims of two other listed creditors were repaid in full by him, and that two others hold no valid claims. See VI-11 (letter dated May 7, 2008, sent by Stingfree counsel to counsel for Victor Campos/Grupo Ravi de Mexico asserting, inter alia, that the debtor is owed $50,000).

The bankruptcy claims register reflects a $300 IRS claim, claims filed by the two Vito companies, Americ Investments Co. and VI Capital Co., claims by the Vitos exceeding $4 million, a claim by Fonika for $35,000, and a claim for more than $100,000 by a law firm that employs Dr. DiMario's son. The only other proofs of claims were filed by the debtor on behalf of individuals purporting to be shareholders of the debtor, in which the debtor denies owing any monies to these individuals.[11] 12/17/08 at 12:34-:35.

Within one week of filing its bankruptcy petition, Stingfree filed a motion to approve the sale of substantially all of its assets—i.e., the patent rights—to Fonika, plus a motion to approve bidding procedures. Those bidding procedures identify an

---

[11]The debtor's statement of corporate ownership identifies only three shareholders. Ex. VI-5.

auction process after a thirty-day marketing period, with a topping fee of $60,000, and

without credit bidding.  No method of marketing is identified.  Nevertheless, Mr.

Rudinger anticipates engaging a former consultant of the debtor, Intellectual Licensing

Capital Group, Inc. (ILG), ex. D-11, to market the patent rights.  <u>See</u> ex. D-12.[12]

12/17/08 at 11:34-:-35; 1:58-:59.  He also believes that Fonika is prepared to waive the

topping fee provision.

On October 17, 2008, less than one month after commencement of this

chapter 11 case, the debtor filed a complaint against Robert and Lisa Vito, docketed at

Adv. No. 08-0290, which complaint was soon amended.  The amended complaint alleges,

<u>inter alia</u>, that Mr. Vito, while president and chief executive officer of the debtor,

exercised exclusive control of the debtor's operations.  While in such control, he diverted

Stingfree revenues and capital investments for his own benefit, obtained company stock

improperly and without board of director authorization, failed to provide full and

complete company records after his removal as controlling officer in January 2008, and

falsified company records to include loans by him that were never made.

The amended complaint also avers that Stingfree entered into the February

29, 2008 settlement agreement "without knowledge of the full extent of Robert Vito's

fraud and in reliance on representations made by the Vitos regarding the management and

financial operations of the company, that would later prove to be false."  Amended

---

[12]This ILG marketing proposal, for which court approval has not yet been sought,
states only that "ILG will promised [sic] to contact no less than 5 patent buyers and no more than
10 patent buyers and present the opportunity to them for purchase consideration."  Ex. D-12, ¶ 2,
at 3.  The proposal also declares: "We work quickly, usually obtaining results in  9-12 months,
significantly less than the industry average."  <u>Id.</u>, at 4.  The debtor's motion to approve bidding
procedures, however, only provided for a thirty-day marketing period.  Motion, ¶ 17.

Complaint, ¶ 131.  It asserts that the Vitos breached the settlement agreement by failing to

provide all of the debtor's books, records, inventory and supplies.  Id., at ¶¶ 134, 144,

158.  This amended complaint also alleges that the Vitos "secretly modified" the

settlement agreement after it had been presented to the debtor for execution.  Id., at ¶¶

136-37.

      The amended complaint asserts the following claims: Count I, "illegal stock

redemption" under 15 Pa. C.S. §§ 1551, et seq., seeking a declaration that the February

29, 2009 settlement agreement was void; Count II, "fraud" under Pennsylvania common

law seeking damages and a determination that the settlement agreement is unenforceable;

Count III, "preferential transfer" under 11 U.S.C. § 547, seeking to avoid the February 29,

2008 grant of a security interest and promissory note; Count IV, "fraudulent transfer"

under 11 U.S.C. § 548, also seeking to avoid the February 29th transfers of the

promissory note and security interest; Count V, "breach of contract" under Pennsylvania

common law, based upon non-compliance with the terms of the settlement agreement;

Count VI, "turnover" under 11 U.S.C. § 542(e), demanding recovery of any of the

debtor's property or books and records in the Vitos' possession, custody or control; Count

VII, "breach of fiduciary duty," seeking monetary damages; Count VIII, "tortious

interference," seeking monetary damages due to the Vitos' assertion of ownership interest

of the patent rights; Count IX, "conversion," seeking damages for the wrongful

conversion of the debtor's stock and other assets; Count X, "unjust enrichment," seeking

damages equal to the value of property of the debtor wrongfully obtained by the Vitos;

Count XI, "usurpation of corporate opportunities," seeking damages; Count XII,

"injunctive relief," requesting that the Vitos be enjoined, inter alia, for using the Stingfree

16

patents; and Count XIII, "accounting," requesting that the Vitos provide an accounting to the debtor for all corporate revenues and assets obtained by them.

The Vitos have filed a motion to dismiss this amended complaint, which motion is pending.  They contend that, while the factual allegations against them are false, all the claims asserted (except for the breach of contract and the bankruptcy law preference and fraudulent conveyance claims) fall within the scope of the parties' mutual release agreement made in February 2008.  In addition, the Vitos argue that all the claims, including the breach of contract claim but not the two bankruptcy law claims, are subject to the mandatory arbitration provisions of the contract.  And the Vitos assert, for a variety of reasons, that the debtor failed to properly allege valid claims under sections 547 or 548 of the Bankruptcy Code.

In opposing dismissal, Mr. Rudinger made clear that it was Stingfree's intention that this chapter 11 case continue with the sale of the patent rights to Fonika (or a higher bidder) and that the debtor would use the sale proceeds to prosecute its adversary proceeding against the Vitos (and related companies) as well as bring additional litigation against former corporate counsel.[13]  12/17/08 at 2:03-:04.  It expects that all future litigation proceeds would be distributed to its creditors and shareholders.  Id.  The corporation has no intention of resuming any operations.  Id.

---

[13]Stingfree maintains that former corporate counsel did not seek or receive requisite corporate approval to represent the Vitos in its dispute with the corporation.  Therefore, any such claims would not be based upon any federal bankruptcy law provisions.

17

II.


A.


On request of a party in interest, a court may dismiss a chapter 11 case or convert it to chapter 7, "whichever is in the best interest of creditors and the estate, if the movant establishes cause." 11 U.S.C. § 1112(b)(1). While subsection (b)(4) provides some specific examples of circumstances in which cause may arise, those examples are not exclusive. Implicit in section 1112(b)(1) is the requirement that every chapter 11 bankruptcy case be filed in good faith. See, e.g., In re Integrated Telecom Express, Inc., 384 F.3d 108, 118 (3d Cir. 2004); In re SGL Carbon Corp., 200 F.3d 154, 160 (3d Cir. 1999); see also In re Brown, 951 F.2d 564, 567 (3d Cir. 1991); Carolin Corp. v. Miller, 886 F.2d 693, 698 (4th Cir. 1989); In re Chisum, 847 F.2d 597, 600 (9th Cir. 1988); Argus Group 1700, Inc. v. Steinman, 206 B.R. 757 (E.D. Pa. 1997); In re SB Properties, Inc., 185 B.R. 198 (E.D. Pa. 1995). Therefore, if a petition is filed in bad faith, it may be dismissed for cause under section 1112(b)(1). See, e.g., In re Integrated Telecom Express, Inc., 384 F.3d at 118; In re SGL Carbon Corp, 200 F.3d at 162; Carolin Corp. v. Miller; In re Natural Land Corp., 825 F.2d 296 (11th Cir. 1987). The Third Circuit Court of Appeals also has instructed that "[a]t its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy." In re Integrated Telecom Express, Inc., 384 F.3d at 119.


18

In the Third Circuit, "[o]nce at issue, the burden falls upon the bankruptcy petitioner to establish that the petition has been filed in 'good faith.'" In re SGL Carbon Corp., 200 F.3d at 162 n.10. Accordingly, once the movant meets an initial burden of production, the debtor bears the ultimate burden of persuasion on the issue of bad faith.

Whether any bankruptcy case is filed in bad faith depends upon the totality of the circumstances. In re SGL Carbon Corp., 200 F.3d at 162; In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996); see, e.g., Matter of Cohoes Indus. Terminal, Inc., 931 F.2d 222, 227 (2d Cir. 1991); In re Ravick Corp., 106 B.R. 834, 843 (Bankr. D.N.J. 1989). Although the totality of the circumstances approach is not constrained to any particular fact pattern, the Third Circuit has generally observed: "Our cases have accordingly focused on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose, e.g., by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." In re Integrated Telecom Express, Inc., 384 F.3d at 119-20; In re SGL Carbon Corp., 200 F.3d at 165; see Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. Partnership, 526 U.S. 434, 453 (1999).

For example, a chapter 11 case is filed in bad faith when there is no possibility that the debtor can reorganize under chapter 11. See Carolin Corp. v. Miller; see also Matter of Love, 957 F.2d 1350 (7th Cir. 1992); Matter of Cohoes Indus. Terminal, Inc., 931 F.2d 222. In such an instance, the bankruptcy filing merely serves to delay creditors without increasing the value of the estate or preserving any going concern. In addition, bad faith may be present when the debtor is using the bankruptcy filing "merely to obtain tactical litigation advantages." In re SGL Carbon Corp., 200 F.3d at

19

165; see, e.g., In re C-TC 9th Avenue Partnership, 193 B.R. 650, 654 (Bankr. N.D.N.Y. 1995) ("Where the primary purpose of the filing of a Chapter 11 case is as a litigation tactic, the petition may be dismissed for lack of good faith").  Indeed, in In re Argus Group 1700, Inc., 206 B.R. 737, 753 (Bankr. E.D. Pa. 1996), the court noted that, in general, a bankruptcy reorganization case may properly be dismissed as in bad faith "where the bankruptcy petition was filed as a litigation tactic, a forum shopping device and/or to resolve what is essentially a two-party dispute."  Cf. In re Mazzocone, 200 B.R. 568, 576 (E.D. Pa. 1996) (suspension of a bankruptcy case under section 305 was warranted "if the bankruptcy forum is indeed being used as a forum to resolve what is in essence a two-party dispute.").

Accordingly, a bad faith chapter 11 filing may occur when a bankruptcy petition is filed simply to create a bankruptcy forum for a two-party dispute based upon non-bankruptcy law, and no reorganization purpose is intended.   Similarly, a chapter 11 petition may be in bad faith if a particular outcome of the two-party dispute, involving state court claims and implicating pre-existing state court litigation, is necessary for any chapter 11 reorganization to occur.  See also In re SB Properties, Inc., 185 B.R. at 205; In re Fonke, 310 B.R. 809, 817 (Bankr. S.D. Tex. 2004); In re Herndon, 218 B.R. 821, 825 (Bankr. E.D. Va. 1998).

For example, in In re Schlangen, 91 B.R. 834 (Bankr. N.D. Ill. 1988), the bankruptcy court dismissed a chapter 11 case for cause finding that its success depended on the outcome of the adversary proceeding the debtor had filed.  The court observed that the debtor could have brought the same claims as counterclaims in the state court foreclosure lawsuits filed prepetition by her mortgagee.  Id. at 837.  The court further

20

noted that the debtor only scheduled $36,000 in unsecured debt, with one unsecured

creditor—owed $10,000 and a friend of the debtor—testifying that he did not intend to

pursue the debt in the bankruptcy proceeding,  id. at 836, and the others consisting solely

of the debtor's bankruptcy attorneys, who had not attempted to collect on their claims

either.  Id.  The court concluded that "it is clear that the litigation of that claim is the

principal activity of the Debtor and her lawyer in this case."  Id. at 838.

      The Schlangen court cautioned that the debtor's use of the bankruptcy

process to confer federal jurisdiction on state law claims and invoke the automatic stay

"would not compel dismissal of the case for bad faith if the Debtor had other legitimate

purposes for her filing."  Id. at 838.  However, upon consideration of the totality of the

circumstances, the court did not find any legitimate bankruptcy purposes.  "The Debtor's

plan depends upon her success in the federal and state litigation, not any restructuring of

her business or her relationship with creditors.  The Court must find that there is no

business left to reorganize and that this Chapter 11 case cannot serve the purpose of

rehabilitating the Debtor's business."  Id.  Finally, the court noted that "[t]he Debtor's

success in [the] dispute may provide her with a fund with which to pay debts, but that

would be equally true outside Chapter 11."  Id. at 839.

      Various courts and commentators have identified the following non-

exclusive indicia reflecting the possibility of bad faith chapter 11 bankruptcy filing:

> (1) the debtor has few or no unsecured creditors;
> (2) there has been a previous bankruptcy petition by the
> debtor or a related entity;
> (3) the prepetition conduct of the debtor has been improper;
> (4) the petition effectively allows the debtor to evade court
> orders;
> (5) there are few debts to non-moving creditors;
> (6) the petition was filed on the eve of foreclosure;

(7) the foreclosed property is the sole or major asset of the
debtor;
(8) the debtor has no ongoing business or employees;
(9) there is no possibility of reorganization;
(10) the debtor's income is not sufficient to operate;
(11) there was no pressure from non-moving creditors;
(12) reorganization essentially involves the resolution of a
two-party dispute;
(13) a corporate debtor was formed and received title to its
major assets immediately before the petition; and
(14) the debtor filed solely to create the automatic stay.

In re SB Properties, Inc., 185 B.R. at 205 (footnotes omitted) (quoting Mellon Bank v.

Selig (In re Selig), 1993 WL 764800, at *3 (Bankr. M.D. Pa. July 8, 1993)); see generally

In re Cornelius, 195 B.R. 831 (Bankr. N.D.N.Y. 1995); 5 Norton Bankruptcy Law &

Practice 3d, § 103:23 (2009).

Of course, the existence of one or more such indicia does not compel a

finding that the debtor filed its bankruptcy petition in bad faith.  Instead, a court must

consider all of the relevant circumstances surrounding the filing, giving due regard to the

congressional purposes behind chapter 11.[14]  Moreover, the issue of dismissal under

section 1112(b)(1) is committed to bankruptcy court discretion.  See, e.g., In re American

Capital Equipment, LLC, 2008 WL 4597221, at *2 (3d Cir. 2008) (non-precedential).

---

[14]For example, even if venue is proper, the bankruptcy filing in a forum primarily
intended to be inconvenient to the debtor's adversaries may be evidence of bad faith.  See In re
Phoenix Piccadilly, Ltd., 849 F.2d 1393, 1395 (11th Cir. 1988) (debtor filed in Middle District of
Florida although property, employees, creditors and pending state court proceedings were located
in Kentucky).

B.


Prior to confirmation, section 363(b)(1) (incorporated by section 1107(a))

allows a chapter 11 debtor in possession to sell property of the estate outside the ordinary

course of business, subject to court approval.  See, e.g., In re Abbotts Dairies of

Pennsylvania, Inc., 788 F.2d 143, 147 (3d Cir. 1986); In re Ames Department Stores, Inc.,

287 B.R. 112, 118 n.10 (Bankr. S.D.N.Y. 2002)); In re WFDR, Inc., 10 B.R. 109 (Bankr.

N.D. Ga. 1981).  The determining standard for a motion to sell under section 363(b) is

often referred to as the "business judgment test."  See, e.g., In re Montgomery Ward

Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) ("In evaluating whether a sound

business purpose justifies the use, sale or lease of property under Section 363(b), courts

consider a variety of factors, which essentially represent a 'business judgment test.'"); In

re United Healthcare System, Inc., 1997 WL 176574, at *4 (D.N.J. 1997); In re Tom's

Foods Inc., 2005 WL 3022022, at *2 (Bankr. M.D. Ga. 2005); In re Global Crossing Ltd.,

295 B.R. 726, 742 (Bankr. S.D.N.Y. 2003); 3 Collier on Bankruptcy, ¶ 363.02[1][f] (15th

ed. rev. 2007).

The exercise of sound business judgment requires that the method of sale be

reasonable and that the purchaser act in good faith and pay fair value.  See In re Abbotts

Dairies of Pennsylvania, Inc., 788 F.2d at 149-50; In re United Healthcare System, Inc.,

1997 WL 176574, at *4.  Fair value may be a function of appraised value.  See In re

Abbotts Dairies of Pennsylvania, Inc., 788 F.2d at 149.  It may also be achieved at an

auction properly marketed and conducted.  See id.


23

Typically, when the chapter 11 debtor in possession intends to liquidate estate assets, sound business judgment involves acceptance of the highest bid.  See In re Landscape Properties, Inc., 100 B.R. 445, 447 (Bankr. E.D. Ark. 1988); In re Flannery, 11 B.R. 974, 977 (Bankr. E.D. Pa. 1981).  In limited circumstances, however, it may be reasonable to accept a somewhat lower offer if doing so would entail less risk.  See In re Bakalis, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998); see also In re Gulf States Steel, Inc. of Alabama, 285 B.R. 497, 517 (Bankr. N.D. Ala. 2002) ("The First Circuit, as does this Court, acknowledged that the 'highest bid is not always the best bid.'") (quoting In re Gil-Bern Industries, Inc., 526 F.2d 627, 629 (1st Cir. 1975)).

A chapter 11 debtor in possession may seek authority to sell estate property under section 363(b)(1) in conjunction with approval of bidding procedures prior to the actual sale.  See, e.g., In re Muma Services, Inc., 2003 WL 21146741, at *1 (D. Del. 2003); In re Polycel Liquidation, Inc., 2006 WL 4452982, at *2 (Bankr. D.N.J. 2006); 2004 Norton Annual Survey of Bankruptcy Law, Part III, Section E ("It is not uncommon for a debtor to establish bidding procedures and seek court approval of those procedures prior to selecting the high bidder and seeking court approval of a § 363 sale. . . .").  In general, bidding procedures "are designed to: (i) maximize the purchase price of the assets sold; (ii) level the playing field for other potential bidders; (iii) provide protections to a stalking horse; and (iv) provide order to the process."  ABI, Pushing the Envelope in Liquidation of the Estate, § II (D) (Southeast Bankruptcy Workshop, July 28-31, 2004).

Because a bankruptcy court can approve a sale under section 363(b)(1) only if it is undertaken in good faith, see In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d at 149-50 ("[W]e hold that when a bankruptcy court authorizes a sale of assets pursuant to

24

section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the

purchaser."), bidding procedures that violate certain Code provisions or chill competitive

bidding will prevent the sale from receiving court approval.  See also In re LCCH

Liquidating Corp., 276 B.R. 106, 108 (Bankr. W.D. Va. 2001):

> The Board of the Hospital proposed to the Court that it be
> allowed to sell its operating assets to a new entity representing
> in effect a joint venture between itself and a larger regional
> healthcare organization known as Mountain States Health
> Alliance.  Under this proposal some of the members of the
> Hospital's existing Board would become board members of
> the new entity and the Lee County community would have a
> continuing voice in the operation of the facility.  This
> proposal was approved by the Court, subject, however, to
> bidding procedures which would allow other potential
> acquirers of the Hospital to come to the table.  It is fair to say
> that the bidding procedures originally proposed by the Debtor
> would have tended to discourage the participation of other
> potential bidders, but as a result of objections raised by the
> United States Trustee and the Unsecured Creditors Committee
> as well as concerns expressed by the Court, the procedures
> ultimately approved were opened up significantly.

Bidding procedures will vary depending upon the type of assets to be sold,

whether there is an initial purchase offer accepted subject to competing bids (referred to

as a "stalking horse"), and the method of sale.  There are, however, some aspects of the

bidding process that are commonly addressed when court approval is sought.  These

include:

> (i) the deadline to make a qualified offer; (ii) the definition of
> a qualified offer including specific terms, proof of financial
> ability, and deposit requirements; (iii) description of the
> stalking horse's offer; (iv) information regarding due
> diligence; (v) date of the sale hearing (i.e., auction); (vi)
> protections for a stalking horse, including break-up fee,
> topping fee, minimum overbid and incremental bidding
> requirements, and reimbursement of expenses related to due
> diligence; (vii) provisions relating to potential credit bids
> under §§ 363(k), 1129(b)(2)(A)(ii); (viii) statement of the

25

> court's jurisdiction to determine disputes arising from the
> bidding procedures or the auction; (ix) an outside closing
> date; (x) a provision requiring that all bids remain open until
> the successful bid is approved and the sale is closed; and (xi)
> a provision that additional bidding procedures may be
> announced at the sale hearing, or after.

ABI, Pushing the Envelope in Liquidation of the Estate, § II (E) (Southeast Bankruptcy

Workshop, July 28-31, 2004).

Bankruptcy court review of bidding procedures made in conjunction with

authorization of a debtor in possession's motion to sell estate property under section

362(b)(1), which review is designed to insure that the successful bidder is acting in good

faith, is not considered advisory.  See generally In re LCCH Liquidating Corp., 276 B.R.

at 108; cf. Surrick v. Killion, 449 F.3d 520 (3d Cir. 2006) (discussing declaratory

judgments); Step-Saver Data Systems, Inc. v. Wyse Technology, 912 F.2d 643 (3d Cir.

1990) (same).

Here, the Vitos (and to a lesser extent the United States trustee) raise a

number of objections to Stingfree's proposed bidding procedures.  The Vitos' foremost

objection is that the debtor is attempting to sell patent rights it no longer owns.  Before I

consider those objections, it is appropriate to address the Vitos' request that this case be

dismissed.  If dismissal is warranted, the debtor's motion to approve bidding procedures

becomes moot.

Therefore, I turn to dismissal first.

26

III.


A.


In support of their motion to dismiss, the Vitos liken this chapter 11 case to those described in decisions such as <u>Schlangen</u> and <u>Ravick</u>, and submit both that Stingfree cannot reorganize and that Stingfree filed bankruptcy only to obtain a tactical advantage in its existing litigation with the Vitos.  The debtor's filing bankruptcy on the eve of the state court hearing concerning the Vitos' confessed judgment was, in the Vitos' belief, designed solely to forum-shop, as well as to misuse the provisions of section 363(f) by attempting to sell assets to which the debtor no longer held any interest to a newly formed entity that involves certain of the debtor's shareholders, and for a price much less than market value.[15]

In so contending, the Vitos also emphasize that Stingfree has no active business, and engages two part-time employees who are not being paid and whose primary duties on behalf of the debtor are to oversee litigation involving the Vitos.  The

---

[15]To the extent the Vitos suggest that the debtor filed this chapter 11 case as an improper litigation tactic to misuse section 363(f)(4), for extensive reasons given in open court at a hearing held on November 12, 2008, and which reasons will not now be repeated, I rejected the debtor's argument that merely filing litigation that asserts ownership of property titled in the name of a non-debtor gives a bankruptcy fiduciary the right to sell the property under section 363(f)(4).  Likelihood that the debtor will ultimately found to be the owner must be demonstrated in those circumstances before relief under section 363(f)(4) is warranted.  <u>See generally</u> <u>State of Missouri v. U.S. Bankruptcy Court for E.D. of Arkansas</u>, 647 F.2d 768, 778 (8th Cir. 1981); <u>In re Robotic Vision Systems, Inc.</u>, 322 B.R. 502 (Bankr. D.N.H. 2005); <u>In re Southwest Florida Heart Group</u>, 342 B.R. 639 (Bankr. M.D. Fla. 2006).

27

chapter 11 bankruptcy case is being funded by the proposed purchaser of the patents.

And, according to the Vitos, the purchase price is far less than the patents are worth, and

no proper marketing is to be undertaken.  Moreover, the Vitos argue, if the debtor no

longer has any interest in the patent rights, then it owns assets of only nominal value and

cannot reorganize without the support of the debtor's largest creditors: the Vitos.  They

also maintain that the debtor has few actual creditors besides the Vitos themselves.

Indeed, the Vitos assert that this bankruptcy case is no more than a two-party dispute that

can and should be resolved in state court and through arbitration.  See generally In re

Gonic Realty Trust, 909 F.2d 624, 627 (1st Cir. 1990).

      The debtor concedes that this chapter 11 case is designed solely to liquidate

the debtor's assets and was filed just before a September 25, 2008 hearing in the state

court on its motion to strike the Vitos' confessed judgment.  Debtor's Posttrial Brief, at

12.[16]  It asserts, though, that it needed a breathing spell from such litigation, due to its

lack of funds, in order to preserve its assets.  Id.  Furthermore, Stingfree maintains that

its claims against the Vitos—raised in the pending adversary proceeding—are valid and

must be included among its assets.  Moreover, some of those claims, as well as a claim

under Article 9 of Pennsylvania's version of the Uniform Commercial Code that the

debtor may seek to add to its amended complaint, will permit it to rescind the February

---

[16]I deny the Vitos' motion to strike this memorandum, even though it was filed
one day late.  No prejudice was caused by this lateness.

28

29th settlement agreement and recover title to its patent assets.[17]  In addition, the debtor

emphasizes that the preference and fraudulent conveyance claims under sections 547 and

548 can only be raised in a bankruptcy forum.

B.

It is clear from the evidence that this chapter 11 case was not filed to

preserve any going-concern value of Stingfree.  It is presently not an operating entity and,

regardless of the outcome of its dispute with the Vitos, it has no intention of resuming any

operations.  The debtor does argue, however, that this chapter 11 bankruptcy case allows

it to maximize the value of its estate for distribution to creditors and shareholders through

a liquidating chapter 11 plan.  See generally 11 U.S.C. § 1123(b)(4); In re Jartran, Inc.,

886 F.2d 859, 868 (7th Cir. 1989); In re River Village Associates, 181 B.R. 795, 805

(E.D. Pa. 1995).

If I exclude consideration of the bankruptcy law preference and fraudulent

transfer claims asserted against the Vitos in the pending adversary proceeding and

initially focus upon the state law claims,[18] two conclusions become apparent.  First, these

---

[17]The debtor argues, perhaps with some validity, that the Vitos assert ownership of the patents but then confessed judgment in an amount equal to the promissory note, thus giving no credit to the value of those patents.  Any failure to credit the value of the patents, however, would likely reduce the amount owed on the confessed judgment rather than restore the patents to Stingfree.

[18]As the "turnover" relief under section 542 raised by the debtor in its amended complaint is included in its breach of contract claim—the Vitos promised to turnover books, records and property of the debtor held by them to the best of their ability—I treat this claim as though it were a state law claim.

29

claims could have been raised without the necessity of filing any bankruptcy petition; indeed, some had been raised in state court and were pending when this chapter 11 case commenced. Second, the state law claims, including those for equitable relief, fall within the scope of the mandatory arbitration provision of the settlement agreement.

Section VII(B) of the February 29th agreement stated that "[a]ny controversies or disputes arising out of or relating to this Agreement shall be resolved by binding arbitration. . . ." It further provided that "[t]he Arbitrator shall have the power to issue mandatory orders and restraining orders in connection with the arbitration." The debtor's illegal stock redemption, fraud, breach of contract, turnover of records, breach of fiduciary duty, tortious interference, conversion, damages for use of the patents, unjust enrichment, usurpation of corporate opportunities, accounting and injunctive relief, are all claims that arise out of or relate to the settlement agreement. Resolution of those claims involves a determination of the scope of the release given to the Vitos under the agreement, the scope of the representations and promises made by the Vitos to Stingfree, including whether the Vitos used their "best efforts" to turn over all books and records of the debtor, and the legal effect of the patent assignment provisions. Similarly, Stingfree's arguments concerning the Vitos' alleged non-compliance with the Pennsylvania Uniform Commercial Code would be arbitrable, as the resolution involves an interpretation of the rights of the parties under the February 29, 2008 agreement, and the assignment of patent rights.

I appreciate that the debtor and Stingfree have different viewpoints regarding those matters. But they contractually agreed to have their disputes decided by an arbitrator. (Indeed, the debtor raised the issue of arbitration with the state court.) And

30

federal courts, including bankruptcy courts, <u>see</u>, <u>e.g.</u>, <u>In re Mintze</u>, 434 F.3d 222 (3d Cir. 2006), by virtue of the Federal Arbitration Act, 9 U.S.C. §§ 1 <u>et seq.</u>, have no discretion to refuse to enforce such a contractual arbitration clause.  Thus, a chapter 11 debtor in possession is bound by a debtor's prepetition agreement to arbitrate.  <u>See</u>, <u>e.g.</u>, <u>In re Hagerstown Fiber LP</u>, 277 B.R. 181, 200, 206 (Bankr. S.D.N.Y. 2002).

I also recognize that the debtor contends that the entire settlement agreement is unenforceable and must be rescinded, while the Vitos argue otherwise. However, that issue is also one that must be determined by the arbitrator.  <u>See</u> <u>Buckeye Check Cashing, Inc. v. Cardegna</u>, 546 U.S. 440, 126 S. Ct. 1204, 1210 (2006) ("We reaffirm today that, regardless of whether the challenge is brought in federal or state court, a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator."); <u>Prima Paint Corp. v. Flood & Conklin Mfg. Co.</u>, 388 U.S. 395, 403-404 (1967).

Stingfree seeks to avoid the Vitos' assertion that many of its claims against them are subject to compulsory arbitration by contending that the Vitos waived their arbitration rights when they confessed judgment in state court.  "[W]aiver of the right to arbitrate based on litigation conduct remains presumptively an issue for the court to decide. . . ."  <u>Ehleiter v. Grapetree Shores, Inc.</u>, 482 F.3d 207, 221 (3d Cir. 2007). Moreover, "[c]onsistent with the strong preference for arbitration in federal courts, waiver 'is not to be lightly inferred.'"  <u>PaineWebber Inc. v. Faragalli</u>,  61 F.3d 1063, 1068 (3d Cir. 1995) (quoting <u>Gavlik Const. Co. v. H.F. Campbell Co.</u>, 526 F.2d 777, 783 (3d Cir. 1975).  Furthermore, the evidentiary burden is upon the party that asserts that such a

31

waiver occurred.  See Great Western Mortg. Corp. v. Peacock, 110 F.3d 222, 233 (3d Cir.

1997).

   The Vitos dispute that they waived their contractual right to arbitrate by

emphasizing that the parties agreed in their February 29th settlement that "[a]ll defaults,

*except monetary defaults*, are curable and if not so cured shall be resolved according to

the Dispute Resolution Section herein."  Exs. D-3, VI-27, ¶ VIII(A) (emphasis added).

Thus, consistent with the provisions of the promissory note that was part of the settlement

documents, they assert that the arbitration provision found in the Dispute Resolution

section did not apply to Stingfree's failure to tender the first monetary payment due in

May 2008, and thus the Vitos had the contractual right to confess judgment without

waiving arbitration.[19]  While this language supports the Vitos' position, there is an

alternative basis for concluding that the Vitos did not waive the arbitration provision of

the settlement agreement.[20]

---

[19]This would render the arbitration provision somewhat one-sided, as Stingfree's obligations under the settlement agreement were primarily monetary, while the Vitos' obligations were not.  However, this practical effect would not render the arbitration provision unconscionable under Pennsylvania law, given that it was negotiated by business persons who had counsel.  See generally Salley v. Option One Mortgage Corp., 925 A.2d 115 (Pa. 2007); Vasilis v. Bell of Pennsylvania, 409 Pa. Super. 396, 401 (1991) ("We are inclined to agree with appellee that where, as here, a contract provision affects commercial entities with meaningful choices at their disposal, the clause in question will rarely be deemed unconscionable.").  Indeed, Stingfree does not contend that the arbitration clause is invalid.  Debtor's Posttrial Brief, at 7.

[20]I note that numerous courts have concluded that a creditor who files a proof of claim in a bankruptcy case does not, by that act alone, waive its contractual right to arbitrate a dispute.  See, e.g., In re Kaiser Group Int'l, Inc., 307 B.R. 449, 454-55 (D. Del. 2004); In re Hart Ski Mfg. Co., 22 B.R. 763, 765 (D. Minn. 1982), aff'd, 711 F.2d 845 (8th Cir. 1983); In re Mor-Ben Ins. Markets Corp., 73 B.R. 644, 647 (B.A.P. 9th Cir. 1987) ("A claim may be filed to secure a creditor's right to partake in distribution of the debtor's estate without waiving his right to arbitration."); In re Transport Associates, Inc., 263 B.R. 531, 536 (Bankr. W.D. Ky. 2001) ("Bankruptcy courts uniformly hold that filing a proof of claim does not waive a party's right to
(continued...)

In general, whether a party has waived a contractual right to arbitrate "will normally be found only 'where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery.'" PaineWebber Inc. v. Faragalli, 61 F.3d at 1068-69 (quoting Gavlik Const. Co. v. H.F. Campbell Co., 526 F.2d at 783)).  More specifically:

> In Hoxworth, we observed that "prejudice is the touchstone for determining whether the right to arbitrate has been waived" by litigation conduct.  980 F.2d at 925.  After surveying the case law of our court and other circuits, we compiled a nonexclusive list of factors relevant to the prejudice inquiry: "[1] the timeliness or lack thereof of a motion to arbitrate . . . [; 2] the degree to which the party seeking to compel arbitration [or to stay court proceedings pending arbitration] has contested the merits of its opponent's claims; [3] whether that party has informed its adversary of the intention to seek arbitration even if it has not yet filed a motion to stay the district court proceedings; [4] the extent of its non-merits motion practice; [5] its assent to the [trial] court's pretrial orders; and [6] the extent to which both parties have engaged in discovery."  Id. at 926-27 (internal citations omitted).

Ehleiter v. Grapetree Shores, Inc., 482 F.3d at 222; see, e.g., Zimmer v. CooperNeff Advisors, Inc., 523 F.3d 224, 231-32 (3d Cir. 2008); South Broward Hospital District v. Medquist, Inc., 258 Fed. Appx. 466, 467-68 (3d Cir. 2007) (non-precedential).

Here, the only evidence presented was that the Vitos confessed judgment against Stingfree in the Pennsylvania state court two or three months prior to the debtor's bankruptcy filing, and that Stingfree had filed a petition in state court seeking to strike that confessed judgment based, in part, upon mandatory arbitration.  Thereafter,

---

[20](...continued)
invoke an arbitration provision."); see also In re Mintze, 434 F.3d at 225-26 (adversary proceeding commenced after defendant/creditor filed a proof of claim was arbitrable); In re Cooley (same).  In this contested matter, Stingfree does not argue to the contrary.

33

resolution of the debtor's state court petition was stayed by the debtor's bankruptcy filing.

Given the debtor's burden on the issue of waiver, these limited facts do not

demonstrate prejudice to Stingfree, were arbitration now compelled, that is sufficient to

override the preference established by the Federal Arbitration Act for enforcement of

contractual arbitration provisions.  Accordingly, as the Vitos did not waive their right to

arbitrate disputes arising from the February 29th settlement agreement, many of the

claims in the adversary proceeding that serves as the centerpiece of this chapter 11 case

cannot be heard in this forum.[21]

---

[21]As I conclude that the debtor must arbitrate its claims against the Vitos "arising
out of or relating to" the February 29, 2008 stock redemption, separation and settlement
agreement, I need not determine whether those claims have any merit.  For example, the Vitos
contend that Count I of the debtor's amended complaint based upon 15 Pa. C.S.A. § 1551 would,
if proven, only provide monetary relief against those Stingfree directors that approved the Vitos'
stock redemption, pursuant to 15 Pa. C.S.A. § 1553, rather than void the stock redemption.  Cf.
Triumph Smokes, Inc. v. Sarlo, 482 S.W.2d 696 (Ct. App. Tex. 1972) (construing a similar
provision under Texas law); In re Amp'd Mobile, Inc., 395 B.R. 582 (Bankr. D. Del. 2008)
(discussing the former shareholder's right to contribution from former directors based upon a
similar Delaware provision).

The Vitos also maintain that, prior to the February agreement, Stingfree was
aware through its own investigation, and the report of its accountant, of potential fraud claims
against Mr. Vito.  Nonetheless, it sought no specific representations concerning those issues.  See
generally Mergens v. Dreyfoos, 166 F.3d 1114, 1118 (11th Cir. 1999) (plaintiffs limited to
breach of contract claim if representations are in default, but not fraud given its knowledge).

Similarly, I leave to the arbitration panel to resolve the parties' differences
regarding whether the February 2008 agreement was fully integrated, whether Mr. Vito was
required to obtain ownership of the debtor's patent rights solely through remedies established by
Pennsylvania's version of the Uniform Commercial Code, Article 9, as well as the scope of the
parties' representations and their mutual releases.

On that latter issue, the debtor asserts in a supplemental memorandum that Mr.
Vito is being investigated by state and federal authorities for securities fraud; futhermore, it
believes that if Mr. Vito is shown to have committed such acts, the February 29, 2008 settlement
agreement will be nullified.  Since a valid release of claims can include conduct amounting to
securities fraud, see generally Korn v. Franchard Corp., 388 F. Supp. 1326 (S.D.N.Y. 1975); see
also In re Eastwind Group, Inc., 303 B.R. 743 (Bankr. E.D. Pa. 2004) (approving a settlement of
such claims), the arbitrator must determine whether any such civil claims were released by
Stingfree in February 2008.  See generally FS Photo, Inc. v. Picturevision, Inc., 61 F. Supp.2d
(continued...)

C.


The bankruptcy claims for preference and fraudulent conveyance would not

be arbitrable as they are claims created by the Bankruptcy Code, to be prosecuted by a

bankruptcy fiduciary for the benefit of all creditors.  See In re Paul, 2008 WL 4844768, at

*20-*22 (Bankr. D. Mass. 2008); In re Bethlehem Steel Corp., 390 B.R. 784 (Bankr.

S.D.N.Y. 2008) In re EXDS, Inc., 316 B.R. 817, 826 (Bankr. D. Del. 2004); see also In re

Mintze, 434 F.3d at 231-32 ("With no bankruptcy issue to be decided by the Bankruptcy

Court, we cannot find an inherent conflict between arbitration of Mintze's federal and

state consumer protection issues and the underlying purposes of the Bankruptcy Code.").

In these contested matters, I need not decide whether Stingfree would

prevail on the merits of preference and fraudulent conveyance claims.  If it is clear at this

juncture, however, that Stingfree's two avoidance claims based upon bankruptcy law are

problematic, then under the circumstances of this case—i.e., with no going concern

entity; virtually no employees; no operations; minimal tangible assets aside from patent

rights that appear to have been assigned to the Vitos; and state law claims against the

Vitos that must be arbitrated—continuation of this chapter 11 bankruptcy filing simply to

litigate doubtful bankruptcy avoidance claims would achieve no valid purpose.  Until an

arbitrator determines whether Stingfree's other claims against the Vitos are meritorious,

including Stingfree's assertion that it still owns the patent rights, this chapter 11 case

cannot proceed to confirmation.

---

[21](...continued)
473, 481-82 (E.D. Va. 1999) (release did not include fraud claims).

As for the preference claim, Stingfree may have difficulty establishing all of the elements of section 547(b).  For example, if the challenged transfer occurred in July 2008, when the Vitos assert that they took ownership of the debtor's patent rights, the Vitos were already secured creditors by virtue of the February 2008 settlement agreement.  Typically, the requirements of section 547(b)(5) will not be met when a secured creditor obtains its collateral prepetition.  As one commentator has observed: "[g]enerally, payments to a fully secured creditor will not be considered preferential because the creditor would not receive more than in a chapter 7 liquidation."  5 Collier on Bankruptcy, ¶ 547.03[7], at 547-46 (15th ed. rev. 2008).  This follows because, in a chapter 7 case, the secured creditor is entitled to the value of its collateral.  See, e.g., In re Villamont-Oxford Associates, L.P., 236 B.R. 467, 477-78 (Bankr. M.D. Fla. 1999); 4 Norton Bankruptcy Law and Practice 2d, § 66:12 (2008) ("[I]f a creditor with a valid security interest repossesses the collateral prior to bankruptcy, there is no preferential effect—he would have received the value of the collateral as part of the distribution in any event."); see also In re Union Meeting Partners, 163 B.R. 229, 236-37 (Bankr. E.D. Pa. 1994).

If Stingfree contends that a preferential transfer took place in February 2008 by the creation of a security interest in favor of the Vitos, then this transfer would have occurred beyond the 90-day period found in section 547(b)(4)(A).  Stingfree then must demonstrate that the Vitos were "insiders" under section 547(b)(4)(B) to extend the reachback period to one year.  In light of Mr. Vito's purported ouster by the corporation in January 2008, his insider status at that time will be contested.  See generally In re Winstar Communications, No. 07-2569, slip op. (3d Cir., Feb. 3, 2009).  And even if

36

Stingfree overcomes that hurdle, the Third Circuit's decision in <u>Lewis v. Diethorn</u>, 893

F.2d 648, 650 (3d Cir. 1990), seems to hold that the challenged transfer, which was part

of an agreement that provided for the transfer to the debtor of the Vitos' stock, plus

consideration including mutual releases, a non-competition agreement, termination of an

employment contract, and dismissal of litigation, would likely be viewed as a

"contemporaneous exchange for new value given to the debtor" within the scope of

section 547(c)(1).[22]

  As for the fraudulent conveyance count based upon section 548, clearly the

debtor cannot be relying upon section 548(a)(1)(A): the actual fraud provision.  As

Stingfree's counsel has acknowledged, this provision addresses actual fraud by the

transferor, not the transferee.  <u>See</u>, <u>e.g.</u>, <u>In re Eckert</u>, 388 B.R. 813, 830 (Bankr. N.D. Ill.

2008) (citing <u>In re Cohen</u>, 199 B.R. 709, 716-17 (B.A.P. 9th Cir. 1996)); <u>In re Andrew</u>

<u>Velez Const., Inc.</u>, 373 B.R. 262, 269 (Bankr. S.D.N.Y. 2007) (citing <u>In re Bayou Group,</u>

<u>LLC</u>, 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007)).  Stingfree does not propose to

demonstrate its own fraudulent intent in reaching a global accord with the Vitos in

February 2008.

  Therefore, the debtor's bankruptcy law fraudulent transfer claim must be

based upon section 548(a)(1)(B).  This statutory provision involves avoidance of transfers

that were constructively fraudulent, because, <u>inter</u> <u>alia</u>, the transferor received "less than

reasonably equivalent value in exchange for such transfer." 11 U.S.C. § 548(a)(1)(B)(i);

<u>see</u>, <u>e.g.</u>, <u>In re Fruehauf Trailer Corp.</u>, 444 F.3d 203, 210-11 (3d Cir. 2006).  Both direct

---

  [22]The Vitos also imply that they can overcome the rebuttable presumption of
insolvency under section 547(f).  <u>See</u> Vitos' Memorandum at 19.

and indirect benefits received by the debtor are considered in this analysis.  See Mellon

Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 646-47 (3d Cir. 1991).  Thus,

to prevail on this claim, Stingfree must demonstrate that the consideration received from

the Vitos was not reasonably equivalent to the security interest in the patents it provided

to them.[23]  See, e.g., In re Fruehauf Trailer Corp., 444 F.3d at 211("The party bringing the

fraudulent conveyance action bears the burden of proving each of these elements [in

section 548(a)(1)(B)] by a preponderance of the evidence."); In re Morris

Communications, NC, Inc., 914 F.2d 458, 466  (4th Cir. 1990).  This will be problematic,

given that the Vitos appeared to have transferred, inter alia, a majority interest in

Stingfree stock that Mr. Rudinger valued in February 2008 as worth at least $3.9

million,[24] and which he hoped to sell via a private placement memorandum for more than

$15 million.  See, e.g., In re Morris Communications, NC, Inc., 914 F.2d at 466 ("The

date for defining such reasonable equivalence is the date of the transfer. . . ."); 5 Collier

on Bankruptcy, ¶ 548.05[1][b], at 548-38 (15th ed. rev. 2008) ("The critical time is when

the transfer is 'made.'"); see also In re R.M.L., Inc., 92 F.3d 139, 152 (3d Cir. 1996)

("[S]o long as there is some chance that a contemplated investment will generate a

---

[23]No payments were made on the promissory note.

[24]Indeed, the debtor's litigation strategy is based upon the assumption that, if the
February 2008 settlement agreement were rescinded, the Vitos would not hold the majority
shareholder interest in the corporation.  Clearly, the Vitos do not agree with this assumption.
Prior to February 29, 2008, the Vitos were asserting that they held the majority of Stingfree
shares and sought a special shareholders meeting to vote that majority interest.

positive return at the time of the disputed transfer, we will find that value has been conferred.").[25]

        Without now concluding that Stingfree has no valid claims against the Vitos under section 547 and 548 of the Bankruptcy Code, I do find, based upon the evidence presented in these contested matters, that the debtor's likelihood of prevailing is sufficiently doubtful so that continuation of this chapter 11 case simply to litigate such claims is inappropriate.

IV.

        In sum, based upon the evidence presented, the debtor is an entity without current operations, virtually no employees or tangible assets, and which filed its bankruptcy petition on the eve of a state court hearing involving its chief adversary. It proposes to reorganize by selling assets it encumbered prepetition, with the sale to an entity formed just prior to the bankruptcy filing and that funded the bankruptcy petition to date, and with little or no marketing. Moreover, the assets to be sold—viz., patent rights—may now be owned by individuals asserting to be the debtor's largest creditors. Thus, the primary activity of this chapter 11 case is for the debtor to litigate against its former chief executive officer (and spouse) to recover those patent rights, based largely,

---

[25]Of course, the debtor now values its patent rights at $300,000. But whatever value they had in February 2008, there was likely a correlation between the value of the principal asset of a corporation and the majority equity interest. Generally, "in the absence of sales showing a market value for stock in a closely held corporation, the value of the stock is predicated upon the market value of the assets of the company after deducting its liabilities." Pabich v. Kellar, 71 S.W.3d 500, 509 (Tex. App. 2002). Section 548(a)(1)(B) looks, in part, to "whether the debtor got roughly the value it gave." In re Fruehauf Trailer Corp., 444 F.3d, at 213.

39

however, upon state law claims that are arbitrable.  Its non-arbitrable preference and

fraudulent transfer claims grounded upon federal bankruptcy law are of doubtful merit.

And there is no ability to reorganize until its litigation claims are resolved in a manner

that rescinds the February 2008 settlement agreement, but does not establish the Vitos as

majority shareholders of the debtor.

        Under these circumstances, the better exercise of discretion, as requested by

the Vitos (and echoed at the conclusion of the evidentiary hearing by the United States

trustee) is to dismiss this case for cause under 11 U.S.C. § 1112(b)(1).  See In re Gonic

Realty Trust, 909 F.2d at 627 (dismissal of chapter 11 case was appropriate when there

was no business to reorganize and debtor's primary activity was to litigate a state law tort

claim);  In re AXL Industries, Inc., 127 B.R. 482, 485 (S.D. Fla. 1991) (dismissing case

when the bankruptcy case cannot be administered until a two-party dispute has been

resolved); see also In re Argus Group 1700, Inc., 206 B.R. 737, 753 (Bankr. E.D. Pa.

1996) (dismissal of the chapter 11 case is appropriate when the case was filed primarily to

obtain a bankruptcy court forum for its state law claims).[26]

---

[26]Dismissal rather than staying this bankruptcy case pending the outcome of the
arbitration is in the interests of all parties.  The latter result may require the debtor to pay
quarterly fees to the United States trustee for no valid purpose.  If the debtor does not prevail in
its state law claims against the Vitos it cannot reorganize.  If it does prevail, it may not need to do
so, or it can file a chapter 11 petition at that time.

An order of dismissal shall be entered.  The debtor's motion to approve
bidding procedures shall be denied as moot.

_____
BRUCE FOX
United States Bankruptcy Judge

Dated:  February 4, 2009